59 CCPA

### Application of TSOUNG–YUAN YAN.
### Patent Appeal No. 8659.

United States Court of Customs and Patent Appeals.

Aug. 31, 1972.

Oswald G. Hayes, New York City, attorney of record, for appellant. Richard K. Stevens, Stevens, Davis, Miller & Mosher, Arlington, Va., of counsel.

S. Wm. Cochran, Washington, D. C., for the Commissioner of Patents. Raymond E. Martin, Washington, D. C., of counsel.

---

Before RICH, Acting Chief Judge, ALMOND, BALDWIN and LANE, Judges, and ROSENSTEIN, Judge, United States Customs Court, sitting by designation.

LANE, Judge.

This appeal is from the decision of the Board of Appeals sustaining the rejection of all the claims, numbered 1–10, of appellant's application for "Hydrocracking Process with Zeolite and Non-Zeolite Base Catalysts"[1] as unpatentable over Young[2] in view of Mason[3] under 35 U.S.C. § 103. We affirm.

## The Invention

The invention relates to catalytic cracking of hydrocarbon feed (petroleum). "Cracking" is "[t]he decomposition by heat, with or without catalysis, of petroleum or heavy petroleum fractions, with production of lower-boiling materials which are useful as motor fuels, domestic fuel oil or other needed products."[4] When cracking is carried out in the presence of hydrogen, the process is known as "hydrocracking." In other words, hydrocracking tends to both break down chemical bonds in the feedstock to form two fragments of lower molecular weight from a single molecule of higher molecular weight and to introduce hydrogen to produce saturated from unsaturated molecules.

Appellant produces gasoline by a catalytic hydrocracking process involving two stages. The first stage uses an amorphous base catalyst and serves not only "to produce gasoline and light products in the usual manner, but mainly to reduce the end boiling point of the charge stock * * *." The term "end boiling point" refers to the boiling point of the portion of the hydrocracked product having the highest boiling point. The amorphous catalytic hydrocracking operation is conducted under such conditions as to convert between about 40 to about 90 volume percent of the feed to products boiling below 700°F. After separation of a gas stream rich in hydrogen from the effluent, the liquid remaining is separated in a distillation column into "a gasoline fraction, a middle fraction boiling from about 400°F. to about 700°F. and a bottoms fraction boiling above about 700°F." The bottom fraction is "returned to the amorphous catalytic zone as a recycle." The middle fraction is passed into a second hydrocracking zone using a zeolite catalyst "wherein it is treated under conditions such as to secure conversion to materials boiling below 400°F. to the extent of preferably from about 50 to about 70 volume percent." The effluent from the zeolite cracking zone is subjected to high pressure separation to remove hydrogen and light gases and the remainder of the effluent goes to the same distillation column to be fractionated together with the liquid effluent from the amorphous hydrocracking zone.

Claim 1 reads as follows:

1. The process for selectively producing gasoline boiling range hydrocarbons by hydrocracking which comprises,

(a) contacting a heavy petroleum hydrocarbon feed with a catalyst comprising an amorphous base and a hydrogenation component in a first reaction zone to convert between about 40 and about 90 volume percent of said feed to materials boiling below 700°F.,

(b) fractionating the effluent from said first reaction zone in a fractionating zone to obtain fractions including a gasoline fraction, a middle fraction boiling between about 400°F. and about 700°F. and a bot-

1. Serial No. 646,898, filed June 19, 1967.

2. U.S.Patent No. 3,287,252, issued November 22, 1966.

3. U.S.Patent No. 3,037,930, issued June 5, 1962.

4. Definition from Condensed Chemical Dictionary, Reinhold Publishing Corp., New York, Sixth Edition, 1961.

toms fraction boiling above about 700°F.,

(c) recycling the bottoms fraction to said first reaction zone,

(d) contacting said middle fraction in a second reaction zone in the presence of a zeolitic hydrocracking catalyst to effect a conversion of at least about 50 volume percent of the charge to material boiling below 400°F., and

(e) fractionating the effluent from said second reaction zone in said fractionating zone.

Claims 2–10 are dependent on claim 1. Appellant states that no contention is made that any of them "recites grounds for patentability apart from the limitations of claim 1 incorporated in each of the dependent claims by reference to claim 1."

### The References

Young discloses hydrocracking hydrocarbon feed stock in two stages, first in contact with an amorphous catalyst and then in contact with a zeolite molecular sieve catalyst. Effluent from the amorphous stage is normally cooled and then passed directly to the zeolitic stage. Effluent from the latter stage is separated into fractions of different boiling points. Recycled hydrogen is withdrawn and the liquid condensate is flashed into a separator from which light hydrocarbon gases and liquid condensates are removed. The condensate is transferred to a fractionating column in which gasoline and unconverted oil boiling above the desired product range are separated. If the oil contains more than about 2% by volume of polycyclic aromatics, it is recycled to the feed line for the amorphous hydrocracking stage. If it contains less than about 2%, it may be recycled directly to the zeolite hydrocracking stage. It is preferred, however, to operate the first or amorphous catalyst stage so that the effluent will contain less than about 2% of polycyclic aromatics.

Mason discloses a two-stage process for converting a hydrocarbon feed, particularly one having a relatively high aromatic hydrocarbon content to a product having a boiling point below the initial boiling point of the feed. Conversion to the extent of 40 to 80 volume percent takes place in the first stage. The second stage uses the same hydrogenating catalyst as the first stage. Effluent from the first stage is separated into gas and liquid portions, and the liquid portion is fractionally distilled into light, gasoline, intermediate and bottoms fractions. The light and gasoline fractions are then removed from the system, the intermediate fraction is passed to the second stage and the bottoms are recycled to the first stage. In the second stage, the intermediate fraction is converted to products boiling below 300°F. to the extent of about 10 to 50 volume percent.

### OPINION

The predominant aspect of appellant's invention is the removal of the heavy components with high boiling points from the effluent of the first (amorphous catalyst) hydrocracker before passing the remaining liquid into the second (zeolite catalyst) hydrocracker. In his specification, appellant explains the reason for the intermediate fractionation:

The heavy portion of the hydrocarbon feed, especially the polycyclics therein, are known to be refractory to hydrocracking in the presence of the zeolite base catalyst and contribute to increased coke deposits when so treated. This results in increased catalyst aging rates and poor catalyst selectivity to gasoline boiling range products.

The board found that Young recognized the adverse effects of polycyclic aromatic hydrocarbons upon the zeolite catalyst. Indeed, Young states:

[I]n view of the deleterious effects of polycyclic aromatics upon paraffin hydrocracking, it is found preferable in those cases where separate catalyst beds are employed in series, to locate the amorphous catalyst ahead of the crystalline [zeolite] catalyst so that

polycyclic aromatics will be mostly converted to hydrogenated and/or hydrocracked products before the crystalline catalyst is contacted.

The board also noted that unconverted oil fractionated from the effluent of the zeolite cracking stage is taught by Young to ordinarily be too rich in polycyclic aromatics to be recycled to the zeolite stage and may be returned to that stage only when the polycyclic aromatic content is less than 2%. If the polycyclic content is greater than 2%, the effluent is recycled to the amorphous stage. The board thus concluded that it would be obvious to one of ordinary skill in this art to modify Young to the extent that the fractionation step is conducted intermediate the two cracking stages rather than subsequent to the second stage. The board agreed with the examiner that Mason taught such an arrangement and relied on Mason to reinforce the conclusion of obviousness of the modification.

Appellant does not contend that he was first to appreciate the limitations of the zeolite catalyst in the hydrocracking process. He acknowledges that the prior art recognized the sensitivity of zeolites to heavy hydrocarbons. What appellant does urge is that there is no realization in the prior art that the catalyst operates efficiently with heavy fractions boiling below about 700°F., but is adversely affected by fractions boiling above about 700°F., and appellant contends that an intermediate fractionation step which controls the input to the zeolite stage is unobvious. The initial questions before us, therefore, are whether it would be prima facie obvious to (1) provide an intermediate fractionation step and (2) advance only that middle fraction boiling below about 700°F. (and above about 400°F.) to the zeolite catalyst cracking stage. We think the answer to each is yes.

Young seeks to attain his objective of "prolong[ing] the effective life of [zeolite] hydrocracking catalysts which are adversely effected [sic] by polycyclic aromatic hydrocarbons" by preferably operating the amorphous catalyst hydrocracker under conditions such that "the effluent therefrom will contain less than about 2% by volume of polycyclic aromatic hydrocarbons." With respect to the product of his subsequent fractionation step, Young states that the "unconverted oil boiling above the desired product range" may be recycled to the amorphous stage if polycyclic content is greater than 2% or the zeolite stage if less than 2% consists of polycyclics. We find that Young clearly teaches the avoidance of contact of heavy hydrocarbons with the zeolite catalyst. Moreover, we agree with the Patent Office that Young's disclosure forcibly prompts the concept of separating out those heavy hydrocarbons between the amorphous and zeolite stages, if they appear in the output of the amorphous cracking stage, and recycling them to the amorphous stage as Young expressly teaches doing with the heavy output of the zeolite stage. Mason's specific disclosure of passing only an intermediate fraction from the effluent of his first stage to his second stage further convinces us that it would be prima facie obvious to one of ordinary skill in the art to use an analogous procedure in the Young process.

In assessing the desired material balances to be sought in the Young process so modified, the ordinary artisan would be aware of the problem being solved and would accordingly determine the outputs of an intermediate fractionation step which can and cannot be tolerated by the zeolite catalyst. Bearing in mind the common objective of Young and appellant to expose the zeolite catalyst to heavy, but not deleterious, hydrocarbon fractions, we agree with the Patent Office that the selection of fractions of suitable boiling point range, including the range claimed by appellant, would be prima facie obvious.[5]

5. Appellant does not appear to advance the broad ranges of conversion recited in the claims as being of any patentable significance.

Satisfied that the Patent Office has made out a prima facie case of obviousness, we turn to the examples set out in appellant's specification upon which appellant relies as establishing unexpected results and nonobviousness. See In re Lintner, 458 F.2d 1013, 59 CCPA (1972); In re Hyson, 453 F.2d 764, 59 CCPA 782 (1972). The examples report operations performed with two different feed stocks, a "high" end point charge having an end boiling point of about 786°F. and a "low" end point charge having an end boiling point of about 728° F., each applied to a single stage hydrocracker using a zeolite catalyst. The hydrocracker treating the "high" end point charge lost efficiency in a couple of days while that treating the "low" end point charge retained its efficiency after more than twenty days of operation. The board noted that the specification provides no data concerning results obtained when a feedstock is hydrocracked by passing over an amorphous catalyst and then over a zeolite catalyst. For this reason it found appellant's specification to afford no basis for evaluating differences in results obtained by appellant's claimed process as compared with that of Young.

Appellant contends that the board has imposed an impossible burden upon him since, he asserts, the cost of assembling the equipment and running the process as disclosed by Young would be prohibitive. Moreover, appellant urges that it is unnecessary to compare processes in toto to establish unexpected results.

To the extent that appellant argues that it is not mandatory in every case to compare a claimed process with a prior art process in their entireties in order to establish the patentability of the claimed process, we surely agree with him. What is required as convincing evidence in a given case depends entirely on the proposition sought to be proved by that evidence. Appellant asserts that the examples in his specification prove that a charge having an end boiling point of above 700°F. adversely affects zeolite catalyst efficiency whereas a charge having a lower and boiling point does not. We agree that the full processes need not be run to establish this factually, and we do not understand the board to have taken the position that the examples fail to prove this contention. Accepting for the purposes of this opinion that the contention is accurate, the question becomes whether the determination that 700°F. is a critical temperature successfully rebuts the prima facie case of obviousness. We hold it does not.

As we have already explained, the prior art recognizes that at some point the charge becomes too heavy in hydrocarbons with the result that zeolite efficiency is lost, and for the reasons set forth above, we think that it would be obvious for one of ordinary skill in this art to determine the constituency of the charge at the crucial point. Appellant does not appear to advance end boiling point as a novel indicia of charge composition, and whether the charge material is defined in terms of end boiling point or some other physical property, the task of determining the point at which the composition has an adverse impact on zeolite efficiency is the same.

This is dispositive of what we view as the thrust of appellant's argument. However, if appellant does broadly urge that the claimed process produces unexpectedly different and improved results as compared with Young, then we agree with the board that the evidence provided in the specification is insufficient. There is no showing that any difference is achieved by appellant's process as compared with Young's.

Finding that the Patent Office has made out a prima facie case of obviousness and that appellant has failed to persuasively rebut that case, we affirm the decision of the board sustaining the rejection of the appealed claims under 35 U.S.C. § 103.

Affirmed.